LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
David A. Markman (Nevada Bar No. 12440)
 E-mail: dmarkman@lipsonneilson.com
9900 Covington Cross Dr., Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 Telephone
(702) 382-1512 Facsimile

ZIMMERMAN REED LLP
Caleb Marker (Pro Hac Vice Pending)
 E-mail: caleb.marker@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, California 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

ZIMMERMAN REED LLP
Hart L. Robinovitch (Pro Hac Vice Pending)
 E-mail: hart.robinovitch@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| JOSHUA RILEY, MICHAEL ADAMI, MEGAN DUNCAN, and BENITO ALICIEA JR., as individuals, and on behalf of all others similarly situated, | Case No. |
|---|---|
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **(Jury Trial Demanded)** |
| v. | |
| ZUFFA, LLC, NEULION, INC., and, DOES 1-100, inclusive, | |
| Defendants. | |

COMPLAINT

Joshua Riley, Michael Adami, Megan Duncan and Benito Alicea Jr. (collectively "Plaintiffs"), by and through undersigned counsel, on behalf of themselves individually and all others similarly situated in the Class and subclasses, bring the following Class Action Complaint against ZUFFA, LLC, and NEULION, INC. (collectively "Defendants"), based upon information and belief and the investigation of counsel, except for information based on personal knowledge, and hereby alleges as follows:

**PREAMBLE**

1.    The August 26, 2017 boxing match between Floyd Mayweather ("Mayweather") and Conor McGregor ("McGregor") was billed to the American public (and worldwide) as one of the biggest prize fights ever and dubbed by the media and others as "The Money Fight" and "The Biggest Fight in Combat Sports History" (hereinafter the "Fight"). The Fight was unique as, for the first time, it pitted a boxing champion (Mayweather), against an ultimate fighting/mixed martial arts champion (McGregor), adding significant intrigue and hype to the sporting event. The Fight, ultimately won by Mayweather with a technical knockout in the 10th round, is believed to have been one of the highest grossing and most watched fights in boxing history.[1]

2.    Apart from the gate receipts, hundreds of thousands of boxing fans paid money to see the Fight on pay-per-view ("PPV") broadcasts, including those offered through Defendants' internet and media outlets and platforms, such as

---

[1]  Martin Rogers, *Floyd Mayweather beats Conor McGregor with 10th round TKO in 'The Money Fight'*, USA TODAY (Aug. 28, 2017, 12:56 AM), https://www.usatoday.com/story/sports/boxing/2017/08/26/floyd-mayweather-beats-conor-mcgregor-tko-money-fight/605806001/. *See also*, Brian Mazique, *The Estimated Purses for Floyd Mayweather Vs. Conor McGregor Fight Are Staggering*, FORBES (Jun 16, 2017, 2:32 PM), https://www.forbes.com/sites/brianmazique/2017/06/16/the-estimated-purses-for-floyd-mayweather-vs-conor-mcgregor-fight-are-staggering/#3299add33d00 (estimating Mayweather to earn at least $100 million, increasing up to four times that amount if the event hits its monetary metrics, and McGregor raking in at least $30 million, though both fighters signed confidentiality agreements that restrict them from revealing the financial details publicly).

UFC.com, UFC.tv, and UFC's smartphone application (the "app").  PPV sales alone are believed to have exceeded $300 million for the Fight.[2]

3.      Reviews of the Fight were generally positive with commentators and fans indicating that it was an exciting sporting event, especially compared to Mayweather's previous May 2015 fight against Manny Pacquiao, which was universally criticized and panned due to general lack of excitement largely resulting from Pacquiao's undisclosed shoulder injury and inability to compete to his fullest ability.[3]

4.      Prior to the Fight, Mayweather told the public that he owed them something "to write that wrong" as a result of the lackluster Pacquaio fight.[4] Mayweather and McGregor engaged in a promotional tour and other promotional appearances.  Promoters and Defendants marketed the Fight heavily to fans and PPV customers. All of this added to the hype and excitement the participating boxers, promoters, broadcasters, and Defendants all aimed to capitalize on financially.

5.      While the August 26, 2016 Mayweather – McGregor fight was an exciting sporting event that millions of sports fans wanted to see, with significant hype and pent-up demand, a major problem arose prior to the Fight.  Consumers, like Plaintiff, who purchased the PPV Fight from Defendants via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants at the required price ($99.99), were unable to actually watch the complete Fight under

---

[2] Michael Blaustein, *Mayweather-McGregor was a $700 million behemoth*, N.Y. Post (Aug. 28, 2017, 12:14 PM), http://nypost.com/2017/08/28/mayweather-mcgregor-was-a-700m-behemoth/.

[3] *See generally*, Mike Downey, *Mayweather vs. McGregor: Worth every penny*, CNN (Aug. 27, 2017, 12:44 PM), http://www.cnn.com/2017/08/27/opinions/mayweather-mcgregor-opinion-downey/index.html.

[4] Scott Rafferty, *Floyd Mayweather: 'I Feel Like I Owe Fans' for Disappointing Manny Pacquiao Fight*, Rolling Stone (Aug. 16, 2017), http://www.rollingstone.com/sports/news/mayweather-vs-mcgregory-owes-boxing-fans-for-pacquiao-fight-w498023.

the license purchased due to technical difficulties and insufficient bandwidth and downloading problems, frustrating their PPV transactions and ability to receive what they paid for.

6.    As reported in the aftermath of the Fight, thousands of consumers who purchased the fight through UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants were denied the ability to see the entire Fight broadcast due to widespread "outages" allegedly as a result of the high demand.[5]

7.    Upon information and belief, the broadcast outages occurred due to system overload and insufficient bandwidth and download capacity, among other technical deficiencies, whereby Defendants sold more PPV packages to consumers in the Class than they knew or should have known their broadcast/download system could realistically handle and process without experiencing widespread interference and outages.

8.    Watching a live sporting event where long, short, unannounced, or other sporadic outages occur completely ruins the viewing experience and frustrates the ability of the viewer (and his/her guests) to enjoy the PPV product purchased and experience it to the fullest and intended extent.

9.    Every aspect and reasonable interpretation of Defendants' advertisement and promotion of the PPV Fight was that if consumers paid the $99 price for the PPV they would receive and be able to view, uninterrupted, without doubt, the complete and uninterrupted Fight broadcast. Defendants' inability to ultimately provide a complete and uninterrupted PPV broadcast of the Fight to the

---

[5] Adi Joseph, *UFC.tv crashed two hours before Mayweather-McGregor, and everyone freaked out*, USA TODAY (Aug. 26, 2017, 9:51 PM), http://ftw.usatoday.com/2017/08/mayweather-vs-mcgregor-streaming-ufc-tv-ppv-pay-per-view-time-online-watch. *See also*, A.J. Perez, *Struggled to Stream the "The Money Fight"? UFC.tv customers urged to contact NeuLion,* MMA Junkie (Aug. 27, 2017), *available at:* http://mmajunkie.com/2017/08/struggled-stream-the-money-fight-ufc-customers-contact-neulion; Jon Fingas, *Demand for Mayweather-McGregor fight crashed pay-per-view servers*, Engadget (Aug. 27, 2017), *available at:* https://www.engadget.com/2017/08/27/mayweather-mcgregor-fight-crashes-ppv-servers/.

Class was not due to unforeseen circumstances or an act of nature, but instead from pure greed – namely, Defendants' desire to keep selling more and more and more PPV's, stretching the bandwidth and download capacity of the system to the brink and beyond, irrespective of the risks they were creating for the Class of consumers.

10.    Ultimately the system overloaded and crashed from excessive sales and downloads.  Plaintiffs and Class members obtained only sporadic, interrupted clips, or were unable to view the Fight at all.

11.    As a result, Plaintiffs' contracts for the PPV broadcast were breached.

12.    Defendants also engaged in deceptive and misleading acts, in violation of applicable consumer protection laws, by marketing and selling the PPV on UFC.tv as, *inter alia*, they knew or should have known that the PPV systems' capacity was exceeded and could not adequately handle the volume of PPV sales ultimately reached without suffering outages, compromising the PPV purchases of consumers, yet continued to sell new packages to Class members in order to maximize their revenues.

13.    Despite this, Defendants have not fully rectified the problem and made Plaintiffs and Class members whole by refunding their PPV purchase as well as providing other necessary relief such as reimbursement of other amounts spent by Class members in relation to the Fight and PPV purchase, such as food, drink, and other entertainment expenses.[6]

---

[6] *See* A. J. Perez, *UFC, NeuLion mum on potential refunds for fans unable to stream Mayweather-McGregor fight*, MMA Junkie (Aug. 28, 2017), *available at:* http://mmajunkie.com/2017/08/ufc-neulion-floyd-mayweather-conor-mcgregor-fight-refunds ("The UFC and its streaming partner, NeuLion, have yet to address how – and even if – they will compensate customers who paid $100 for Saturday's Floyd Mayweather vs. Conor McGregor fight and were prevented from viewing it due to technical issues. The main event was delayed due to what Showtime, the fight's primary broadcaster, described as "scattered outages," but the majority of the problems appeared to be with UFC's app that runs on several different platforms and not the outages referenced by Showtime.")

14.     Based on the foregoing, and as further alleged below, this class action lawsuit seeks damages, restitution, and other relief for persons who paid money for the PPV of the Fight through UFC's app and/or through UFC.tv. Those consumers, like Plaintiffs, were denied the benefit of their bargain and as a result, damages, restitution, and other relief are appropriate and necessary. Because of Defendants' conduct described further within, Plaintiffs and members of the Class were injured and incurred financial loss while Defendants profited and were unjustly enriched.

## PARTIES

15.     Plaintiff Joshua Riley ("Riley") is an individual who resides in the State of Florida.  Plaintiff is a member of the Class and Florida Subclass defined below.

16.     Plaintiff Riley, like other members of the Class, paid money to view the PPV broadcast of Mayweather-McGregor fight held on August 26, 2017 via UFC.tv or the UFC app and suffered the loss of money, financial injury, and damage as a result of the acts and omissions of Defendants described herein.  Had Defendants not conducted the deceptive and unfair acts alleged herein, and not omitted material facts regarding system capacities, Plaintiff Riley would not have parted with his money to watch the Fight purchased from Defendants (and/or their agents), and would not have been injured.

17.     The Florida Subclass, as defined below, consists of Plaintiff Riley and all other persons who paid money in the State of Florida to watch the Mayweather-McGregor fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.

18.     Plaintiff Michael Adami ("Adami") is an individual who resides in the State of Illinois.  Plaintiff Adami is a member of the Class and Illinois Subclass defined below.

19.    Plaintiff Adami, like other members of the Class, paid money to view the PPV broadcast of Mayweather-McGregor fight held on August 26, 2017 via UFC.tv or the UFC app and suffered the loss of money, financial injury, and damage as a result of the acts and omissions of Defendants described herein.  Had Defendants not conducted the deceptive and unfair acts alleged herein, and not omitted material facts regarding system capacities, Plaintiff would not have parted with his money to watch the Fight purchased from Defendants (and/or their agents), and would not have been injured.

20.    The Illinois Subclass, as defined below, consists of Plaintiff Adami and all other persons who paid money in the State of Illinois to watch the Mayweather-McGregor fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.

21.    Plaintiff Megan Duncan ("Duncan") is an individual who resides in the State of Arizona.  Plaintiff is a member of the Subclass defined below.

22.    Plaintiff Duncan, like other members of the Class, paid money to view the PPV broadcast of Mayweather-McGregor fight held on August 26, 2017 via UFC.tv or the UFC app and suffered the loss of money, financial injury, and damage as a result of the acts and omissions of Defendants described herein.  Had Defendants not conducted the deceptive and unfair acts alleged herein, and not omitted material facts regarding system capacities, Plaintiff Duncan would not have parted with her money to watch the Fight purchased from Defendants (and/or their agents), and would not have been injured.

23.    Plaintiff Benito Alicea, Jr. ("Alicea") is an individual who resides in the State of Arizona.  Plaintiff is a member of the Arizona Subclass defined below.

24.    Plaintiff Alicea, like other members of the Class, paid money to view the PPV broadcast of Mayweather-McGregor fight held on August 26, 2017 via UFC.tv or the UFC app and suffered the loss of money, financial injury, and damage as a result of the acts and omissions of Defendants described herein.  Had

Defendants not conducted the deceptive and unfair acts alleged herein, and not omitted material facts regarding system capacities, Plaintiff Alicea would not have parted with his money to watch the Fight purchased from Defendants (and/or their agents), and would not have been injured.

25.    The Arizona Subclass, as defined below, consists of Plaintiffs Duncan and Alicea, and all other persons who paid money in the State of Arizona to watch the Mayweather-McGregor fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.

26.    The Class, as defined below, consists of Plaintiffs and all other persons who paid money nationwide to watch the Mayweather-McGregor fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.

27.    Defendant Zuffa, LLC ("Zuffa") is an American sports promotion company specializing in mixed martial arts, doing business as Ultimate Fighting Championship and UFC. It was founded in January 2001 in Las Vegas, Nevada, by Station Casinos executives Frank Fertitta III and Lorenzo Fertitta to be the parent entity of the Ultimate Fighting Championship ("UFC") after they purchased it from the Semaphore Entertainment Group. The word "Zuffa" is an Italian word meaning "fight."

28.    Zuffa is formed under the laws of Nevada, and is located at 2960 W. Sahara Avenue, Las Vegas, Nevada, 89102. It may be served with process by serving its registered agent, L and R Service Company of Nevada, LLC at 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 89169.

29.    Upon information and belief, Zuffa's sole managing member is currently UFC Holdings, LLC ("UFC Holdings").  Upon information and belief, UFC Holdings, LLC is located in Nevada at 2960 W. Sahara Avenue, Las Vegas, Nevada, 89102, and formed under the laws of Delaware and/or Michigan. The citizenship of the members of UFC Holdings, LLC is presently unknown.

30.     Until recently, Zuffa's members were Lorenzo Fertitta, Frank Fertitta and other Nevada residents. *See*, Fertitta Decl. (Sept. 27, 2010) (Doc. 13-2) in *Zuffa, LLC v. Pavia Holdings, LLC*, No 2:10-cv-1427-MMD-NJK (D. Nev.).

31.     Upon information and belief, in 2016 Zuffa was sold in whole or part to UFC Holdings, LLC, WME Entertainment Parent, LLC and/or related entities.[7] Despite any change in ownership, Zuffa continues to conduct business as Ultimate Fighting Championship, UFC, UFC.com, UFC.tv and the UFC app, without interruption, including that involving the sale and marketing of PPV packages of the Fight to Plaintiffs and the Class in Nevada.

32.     At all relevant times Zuffa has been in the business of, among other things, promoting live mixed martial arts (MMA) bouts in the U.S. and elsewhere, under the trade names of the Ultimate Fighting Championship® or UFC®. Under the UFC trademark, which is wholly owned by Zuffa, Zuffa promotes professional MMA events for live audiences as well as live television, Internet and PPV broadcasts, and licenses, markets, sells and distributes UFC licensed merchandise and/or promotional materials including, but not limited to, tickets to bouts, live and taped television programming, broadcasts over an Internet subscription service, sponsorships and other merchandise including video games, action figures, gyms, fitness products, athletic equipment, apparel, footwear, hats, photographs, toys, collectibles, trading cards and digital media products.

---

[7] *See Moody's assigns UFC Holdings, LLC a B2 CFR and the 1st lien term loan a B1 rating; outlook Stable*, July 22, 2016 (https://www.moodys.com/research/Moodys-assigns-UFC-Holdings-LLC-a-B2-CFR-and-the--PR_352576) ("Moody's Investors Service (Moody's) assigned VGD Merger Sub LLC (aka UFC Holdings, LLC (UFC)) a B2 corporate family rating (CFR) and the proposed $150 million revolver and $1,300 million 1st lien term loan a B1 (LGD3) rating. The outlook is stable.  The use of proceeds is to help fund the acquisition of Zuffa LLC (UFC Holdings, LLC will be the rated entity following the close of the transaction) by WME Entertainment Parent, LLC (WME Parent) in partnership with Silver Lake Partners and Kohlberg Kravis Roberts & Co.…UFC Holdings, LLC (aka Zuffa, LLC) is the world's leading promoter of mixed martial arts (MMA) sports competition events. MMA is an individual combat sport with international appeal, which combines techniques from various combat sports and martial arts, including boxing, karate, judo, jiu-jitsu, kickboxing, and wresting and is governed by the "Unified Rules of MMA". Revenues for 2015 were over $600 million.").

33.    Zuffa owns and operates, directly or indirectly, UFC, the UFC.com and UFC.tv websites, and the UFC app for mobile phones and devices. *See,* Terms of Use, *available at:* http://www.ufc.com/termsOfUse.   Through these websites, apps, and other social media outlets and platforms, PPV packages for the Fight were sold to Plaintiffs and the members of the Class.

34.    Ultimate Fighting Championship is owned, operated, or the alter ego of Zuffa. On its website (http://www.ufc.com/discover/ufc), UFC presents itself to the public as an "organization" owned by Zuffa and further states:

> The fastest growing sports organization in the world, the Ultimate Fighting Championship® (UFC®), started in 1993 as a professional mixed martial arts (MMA) organization. UFC has revolutionized the fight business, and today stands as the world's leading MMA promoter, offering the premier series of MMA sports events that have sold out some of the biggest arenas and stadiums across the globe.

> The UFC organization follows a rich history and tradition of competitive MMA dating back to the Olympic Games in Athens. About 80 years ago, a Brazilian form of MMA known as Vale Tudo (anything goes) sparked local interest in the sport. Today, the UFC has evolved into an organization where hybrid athletes are required to know various disciplines in order to compete at an elite level in a regulated environment where safety is paramount. UFC athletes are skilled in many forms of martial arts, including karate, jiu-jitsu, boxing, kickboxing, grappling, wrestling, sumo and other combat sports.

> Owned and operated by Zuffa, LLC, headquartered in Las Vegas and with offices in London, Toronto and Singapore, UFC produces more than 40 live events annually and is the largest Pay-Per-View event provider in the world, broadcast in over 129 countries and territories, to nearly 800 million TV households worldwide, in 28 different languages. UFC content is also distributed commercially in the United States to bars and restaurants through Joe Hand Promotions, in English throughout Canada via Premium Sports Broadcasting Inc. and in French throughout Quebec via Interbox.

> In 2011, the UFC burst into the mainstream with a landmark seven-year broadcast agreement with FOX Sports Media Group. The agreement includes four live events broadcast on the FOX network annually, with additional fight cards and thousands of hours of programming broadcast on FOX properties FOX Sports 1 and FOX Sports 2. This also includes the longest-running sports reality show on television, The Ultimate Fighter®, which airs on FOX Sports 1 in the United States.

> The UFC also connects with tens of millions of fans through its website, UFC.com, as well as social media sites Facebook, Instagram and Twitter. UFC President Dana White is considered one of the most

accessible and followed executives in sports, with over two million followers on Twitter.

In 2014, UFC launched UFC FIGHT PASS™, a digital subscription service with exclusive live events, thousands of fights on-demand and original content. The UFC organization also licenses over 100 UFC GYM® locations

The UFC organization also licenses over 100 UFC GYM® locations, and owns UFC.TV® (offering live event broadcasts and video on-demand around the world), UFC FIT® (an in-home fitness and nutrition program), UFC Magazine, and has a videogame franchise with EA SPORTS, UFC Fight Club®, UFC Fan Expo®, UFC branded apparel, DVDs and Blu-rays and Topps Trading Cards. For more information, visit UFC.com and follow UFC at Facebook.com/UFC, Twitter and Instagram: @UFC.

35.    On the same website UFC also states: "The UFC also holds the distinction as the largest live Pay-Per-View event provider in the world."

36.    On the UFC.com website is a portal for consumers to access UFC.com and purchase the PPV of the Fight. *See*, https://www.ufc.tv/events.

37.    UFC.com, UFC.tv, and the UFC app are owned, operated and/or the alter egos of Zuffa.

38.    UFC, UFC.com, UFC.tv, and the UFC app are controlled by Zuffa. Zuffa conducts business as "UFC", "Ultimate Fighting Championship", "UFC.com", "UFC.tv" and the UFC app and are in all respects the alter egos of UFC, UFC.com, UFC.tv, and the UFC app.

39.    Zuffa, directly or through UFC, and/or other alter ego entities it controlled, contracted with NeuLion, Inc. to provide services that allow Plaintiffs and members of the Class to access and view its content, including the PPV of the Fight, via UFC, UFC.com, UFC.tv, the UFC app and/or other platforms operated by Defendants. *See*, UFC Terms of Use, *available at:* http://www.ufc.com/termsOfUse ("We have contracted with NeuLion, Inc. to provide services that provide You (the subscriber who pays a fee) with the ability to access and view our content.").

40.     Defendant NeuLion, Inc. ("NeuLion") is a technology product and service provider specializing in the broadcasting, distribution, and monetization of live and on-demand digital video content to internet-enabled devices. NeuLion is a Delaware corporation with principle offices located at 1600 Old Country Road, Plainview, New York 11803. It may be served with process by service on its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808.

41.     NeuLion live streamed the Mayweather vs. McGregor fight for several global rights holders worldwide, including UFC®, Sky Sports, Sky New Zealand, and Eleven Sports Network.

42.     NeuLion promoted the Fight as "The Biggest Fight in Combat Sports History" on its website. *See generally*, http://www.neulion.com/.

43.     As reported on NeuLion's website on August 23, 2017 (http://www.neulion.com/ViewArticle.dbml?DB_OEM_ID=30000&ATCLID=2 11662790):

*NeuLion to Live Stream Mayweather vs. McGregor Fight for Several Global Rights Holders, Including UFC®, Sky Sports, Sky New Zealand and Eleven Sports Network*

PLAINVIEW, NY -- August 23, 2017 - <u>NeuLion</u>, Inc. (TSX: <u>NLN</u>), a leading technology product and service provider specializing in the broadcasting, distribution and monetization of live and on-demand digital video content to Internet-enabled devices, today announced that it will live stream the Mayweather vs. McGregor fight for several global rights holders, worldwide, including UFC®, Sky Sports, Sky New Zealand and Eleven Sports Network. Each of these global rights holders will be using the <u>NeuLion Digital Platform</u> for the live streaming of the four-fight SHOWTIME PPV event, taking place Saturday, Aug. 26 at T-Mobile Arena in Las Vegas.

This once-in-a-lifetime event brings together the worlds of boxing and MMA and has captured the imagination of sports fans throughout the globe from the initial announcement of the world tour and now leading up to fight night.

The NeuLion Digital Platform will be handling the authentication and purchasing of the Pay-Per-View (PPV) as fans visit each of the four services, including UFC.TV, Sky Sports Box Office, Sky Fan Pass and the Eleven Sports Network's OTT service. NeuLion will also ensure that each of these services delivers the fight into each of the rights holders' respective licensed territories.

"These partners recognize the value of our depth of global experience and continued focus on delivering outstanding quality," said Roy Reichbach, President and CEO of NeuLion. "To be working with four fantastic NeuLion partners for the streaming, purchasing, and fan experience for one of the largest online events of the year, is very exciting for us."

NeuLion has also designed and developed the consumer experience that UFC, Sky Sports, Sky New Zealand and Eleven Sports Network fans will interact with as they watch the live streaming of the fight on web, mobile, tablet and other connected devices.

UFC, the world's premier mixed martial arts organization, is offering the fight to fans through UFC.TV, Sky Sports is offering the live fight as part of their Sky Box Office service, Sky New Zealand is offering the fight on Sky Fan Pass and Eleven Sports Network is offering the fight through their digital service. NeuLion will be delivering and monitoring the live event from its technical operations centers located in New York and London.

About NeuLion

NeuLion, Inc. (TSX: NLN) offers solutions that power the highest quality digital experiences for live and on-demand content in up to 4K on any device.  Through its end-to-end technology platform, NeuLion enables digital video management, distribution and monetization for content owners worldwide including the NFL, NBA, World Surf League, Univision Deportes, Euroleague Basketball and others.  NeuLion powers the entire video ecosystem for content owners and rights holders, consumer electronic companies, and third party video integrators through its MainConcept business.  NeuLion's robust consumer electronics licensing business enables its customers like Sony, LG, Samsung and others to stream secure, high-quality video seamlessly across their consumer devices. NeuLion is headquartered in Plainview, NY.  For more information about NeuLion, visit www.NeuLion.com.

CONTACT INFORMATION

Press Contact: Chris Wagner | chris.wagner@neulion.com | +1 516 622 8357

Investor Relations Contact: Rob Kelly | rob.kelly@loderockadvisors.com | +1 416 992 4539

44.    Plaintiffs are ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the defendants sued herein as DOES 1 through 100, inclusive, but on information and belief allege that said Defendants are in some manner legally responsible for the unlawful actions, policies, and practices alleged herein, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each

Defendant named herein was the agent of the other, and the agent of all Defendants. Plaintiffs are further informed and believe, and thereon allege, that each Defendant was acting within the course and scope of said agency at all relevant times herein, for the benefit of themselves, each other, and the other Defendants, and that each Defendant's actions as alleged herein were authorized and ratified by the other Defendants. Once the identities of DOES 1 through 100 become known, Plaintiffs will amend this complaint to describe and identify them in greater detail.

## JURISDICTION AND VENUE

45.     Jurisdiction is proper under 28 U.S.C. §1332(d)(2) because this is a class action where the parties are sufficiently diverse. Under the Class Action Fairness Act ("CAFA"), complete diversity is not required; federal courts have original diversity jurisdiction over class actions if the aggregate amount in controversy exceeds $5,000,000 and any class member is a citizen of a state different from any defendant. 28 U.S.C. §1332(d)(2).

46.     Plaintiffs, residents of the States of Florida, Arizona, and Illinois, seek relief on behalf of the Class and their respective State Subclasses, which will result in at least one Class member belonging to a different state than that of Defendants. Upon information and belief, Defendant Zuffa is a citizen of Nevada, Delaware, and/or Michigan. Regardless of Zuffa's citizenship and those of its members, Defendant NeuLion is a citizen of Delaware and New York such that Plaintiffs are citizens of a state different from Defendant NeuLion. Diversity jurisdiction under 28 U.S.C. §1332(d) therefore exists.

47.     In addition, the matter in controversy exceeds $5,000,000 exclusive of interest and costs. Therefore, both diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

48.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 for at least the following reasons: (i) Defendant Zuffa is a resident of Las Vegas, Nevada;

(ii) the Fight occurred within this judicial district at the T-Mobile Arena, 3780 S Las Vegas Blvd., Las Vegas, Nevada 89158, and the PPV broadcast at issue emanated from that site; (iii) NeuLion entered the State of Nevada to participate in the broadcast and distribution of the PPV of the Fight to Plaintiffs and the Class, which took place at the T-Mobile Arena in Las Vegas, Nevada; and (iv) UFC, UFC.com, UFC.tv, and the UFC app are operated in and from Nevada. Defendant Zuffa, UFC and UFC.com's Terms of Use state that lawsuits are properly filed and venued in Las Vegas, Nevada. http://www.ufc.com/termsOfUse.

## FACTUAL ALLEGATIONS

49.    At all times relevant, Plaintiff Riley has been an individual residing within the State of Florida. Plaintiff Riley lives in Palm Meadows, Florida.

50.    At all times relevant, Plaintiff Adami has been an individual residing within the State of Illinois. Plaintiff Adami lives in Park Forest, Illinois.

51.    At all times relevant, Plaintiff Megan Duncan has been an individual residing within the State of Arizona. Plaintiff Duncan lives in Buckeye, Arizona.

52.    At all times relevant, Plaintiff Benito Alicea, Jr. has been an individual residing within the State of Arizona. Plaintiff Alicea lives in Mesa, Arizona.

53.    At all times relevant Defendants, and each of them, conducted business nationwide, including in the States of Florida, Illinois, Arizona, and Nevada, including that related to PPV sales of the Fight broadcast.

54.    Plaintiffs and Class members paid money to watch the Fight on PPV, after months of hype, promotional appearances, and advertisements by Defendants. The Fight was one of the highest priced events of any kind sold in pay-per-view history. The Fight was promoted as "The Biggest Fight in Combat Sports History" and "The Money Fight."

55.    Prior to the Fight, Plaintiffs paid at least $99 to Defendants through UFC.com, UFC.tv, and/or the UFC app to purchase the PPV of the Fight. In doing

so, Plaintiffs entered into a contract to receive the PPV broadcast in exchange for the payment made. Plaintiffs fulfilled their end of the bargain, and otherwise fulfilled all conditions precedent, by paying the $99 charge, as did all other Class members.

56.    In anticipation of the Fight and in reliance on the contractual promises made by Defendants, Plaintiffs Riley, Adami, Duncan, and Alicea expended valuable time and money (on food, beverages, and the like) to host their friends at their respective homes for a private viewing party.

57.    Specifically, Plaintiff Riley encountered the following difficulties. After purchasing the PPV for $99 via UFC.com and/or the UFC app prior to the start of the Fight program, Plaintiff could not log in and actually view the entire Fight on August 28, 2017. Plaintiff was instead informed by Defendants' system the night of August 28, 2017: "Due to overwhelming volume unable to process login." Plaintiff tried to login repeatedly during the undercard fights with great frustration and time expense, while at the same time trying to host an enjoyable and stress-free social event for his guests that he also expended money on to entertain. Finally, just before main fight between Mayweather and McGregor, Plaintiff was forced to purchase a second PPV package at additional out-of-pocket expense through an alternative provider, Showtime. In turn, Plaintiff paid twice for the PPV of the Fight. In turn, he overpaid and was damaged financially, in addition to lost time, frustration, and overall poor experience and detriment caused by Defendants' conduct. Plaintiff was denied the benefit of his bargain and suffered actual and consequential damages as a result of Defendants' conduct.

58.    Likewise, Plaintiff Adami encountered the following difficulties. After purchasing the PPV for $99 via UFC.com and/or the UFC app prior to the start of the Fight program, Plaintiff could not log in and actually view the entire Fight on August 28, 2017. Adami hosted a fight watch party that night for friends (that he also expended money on to entertain) but spent significant time throughout

the night trying to log in to the streaming service. He had numerous disappointed friends at his house because they could not view the Fight via the PPV Adami purchased from Defendants. Adami was unable to log in the whole night. Adami made several attempts via email and chat on August 28, 2017 to get help and his money back, but his attempts were unavailing as Defendants failed to respond. In turn, Adami overpaid and was damaged financially, in addition to lost time, frustration, and overall poor experience and detriment caused by Defendants' conduct.  Plaintiff was denied the benefit of his bargain and suffered actual and consequential damages as a result of Defendants' conduct.

59.    Similarly, Plaintiff Duncan encountered the following difficulties. She pre-ordered the fight through UFC.com and/or the UFC app. She also hosted a fight party with numerous guests in attendance. Prior to the start of the Fight, she was unable to connect to the UFC application. She spent two and a half hours waiting for the app to connect while her fans grew restless. Eventually, with only seven minutes left until the star of the main event, Plaintiff Duncan purchased the fight a second time through a different application. Nonetheless she was unable to view the Fight. She immediately contacted Defendants via chat but they were unable to resolve the problem and Plaintiff Duncan and her guests were unable to access the Fight at all. She emailed Defendants on August 28, 2017 requesting a refund of the $208.44 (the total costs of both purchases), and subsequently followed up her email at various other times between August 28 and the date of filing this lawsuit, but her requests were unavailing. In turn, Duncan overpaid and was damaged financially, in addition to lost time, frustration, and overall poor experience and detriment caused by Defendants' conduct.  Plaintiff was denied the benefit of her bargain and suffered actual and consequential damages as a result of Defendants' conduct.

60.    Plaintiff Alicea encountered the following difficulties. Alicea, like other Plaintiffs, hosted his friends at his house to watch the Fight after ordering it

via UFC.com and/or the UFC app. Alicea expended at least $300 on food, drink, and the like, in addition to the $99 price tag of the Fight. After finding he was unable to stream the Fight early on in the evening, Alicea reached out to technical support for assistance. He chatted with online tech support two to three times throughout the Fight, but they were unable to resolve the streaming issues. As a result, neither Alicea nor any of his guests watched a single second of the Fight or any earlier undercard matches which Alicea had paid for. In turn, Alicea overpaid and was damaged financially, in addition to lost time, frustration, and overall poor experience and detriment caused by Defendants' conduct. Plaintiff was denied the benefit of his bargain and suffered actual and consequential damages as a result of Defendants' conduct.

61.    Defendants sought to sell a record number of PPV packages and maximize revenue. PPV sales continued through the start of the opening round.

62.    Upon information and belief, the fight was postponed for some time in order to process still incoming PPV orders.

63.    Defendants were ill-equipped to provide the number of PPV broadcasts that were sold to all consumers who purchased them.

64.    As a result of system overloads and other technical problems, Plaintiffs and Class members who purchased the PPV, were unable to view the entire PPV broadcast without interruption. As *USA Today* reported, "The main event was delayed due to what Showtime, the fight's primary broadcaster, described as 'scattered outages,' but the majority of the problems appeared to be with UFC's app that runs on several different platforms and not the outages referenced by Showtime."[8]

_____

[8] A. J. Perez, *UFC 'disappointed' by technical difficulties for Mayweather-McGregor; no word on refunds*, USA TODAY (Aug. 28, 2017, 8:50 PM), https://www.usatoday.com/story/sports/boxing/2017/08/28/ufc-floyd-mayweather-conor-mcgregor-fight-technical-difficulties/610713001/. *See also*, Jon Fingas, *Demand for Mayweather-McGregor fight crashes pay-per-view servers*, Engadget (Aug. 27, 2017),

65.    "UFC Fight Pass", the digital streaming service of UFC (and also controlled and operated by Zuffa and/or UFC), sent a tweet on Twitter, on August 26, 2017 at 6:26 PM stating: "Due to overwhelming traffic you may be experiencing log in issues. This will be resolved shortly."

66.    Later at approximately 9:08 PM on August 28, 2017, UFC Fight Pass tweeted: "Apologies for any tech difficulties logging onto http://UFC.TV. Please find an alternative provider here: http://s.sho.com/2izXNhh."

67.    Thousands of consumers who purchased the fight through UFC.com, UFC.tv, UFC's app, and/or other platforms and media outlets operated by Defendants were denied the ability to see the entire Fight broadcast uninterrupted due to widespread "outages." *See* n.5, *supra*. The problem was widespread and not limited or unique to Plaintiffs.

68.    Defendants' failure to deliver the complete and uninterrupted PPV broadcast to all consumers who purchased it, including Plaintiffs and the Class, caused them harm, injury, damage, and out-of-pocket loss.

69.    By failure to deliver the complete and uninterrupted PPV broadcast of the Fight to all consumers who purchased it, Defendants breached contracts with Plaintiffs and members of the Class.  In addition, Defendants engaged in deceptive and misleading conduct, violating various consumer protection laws including, but not limited to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §

---

*available at:* https://www.engadget.com/2017/08/27/mayweather-mcgregor-fight-crashes-ppv-servers/ ("Numerous reports have revealed that servers across the US crashed or buckled under demand for the fight, creating outages serious enough that organizers delayed the fight to make sure people could tune in. Mayweather himself said that pay-per-view servers in California and Florida crashed, while Showtime and UFC failed to load, ran into login trouble and otherwise couldn't keep up with interest."); Michael Blaustein, *Mayweather-McGregor was a $700 million behemoth*, N.Y. POST (Aug. 28, 2017, 12:14 PM), http://nypost.com/2017/08/28/mayweather-mcgregor-was-a-700m-behemoth/ ("In the end, UFC Fight Pass, the promotion's online streaming service, was so popular on fight night that its servers in California and Florida crashed.").

501.201 *et seq.* ("FDUTPA") and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* ("ICFA").

70.    Plaintiffs and the Class were denied the benefit of their bargain because they did not receive the complete and uninterrupted PPV broadcast of the Fight after paying for it.

71.    Plaintiffs, like other reasonable consumers in the Class who purchased the PPV, placed value on the broadcast of the Fight and expected to have an enjoyable night valued at more than the $99 PPV price, and at least no less than the $99 price. In addition, Plaintiffs, like other Class members, invested in and incurred out-of-pocket costs for food, drinks, and the like in order to best enjoy the evening and entertain guests who were invited their homes. This type of activity is both expected, reasonably foreseeable, and encouraged by Defendants when marketing the PPV of the Fight in the manner they did.

72.    Defendants knew or should have known of the restrictions and limitations of their broadcast and download capacity and not sold an excessive number of PPV packages that caused the system to crash and experience outages to the detriment of Plaintiffs and the Class.

73.    By failing to disclose to consumers in the Class that excessive number of PPV packages would be sold, Defendants denied Plaintiffs an important opportunity to view the Fight through alternative, more reliable means.

74.    Plaintiffs and the Class, paying a premium price for the PPV (one of the highest prices ever), reasonably relied on Defendants to provide a complete and uninterrupted broadcast of the entire Fight programming via PPV. Defendants failed to do this. Defendants knew or should have reasonably foreseen that outages would occur once the number of PPV purchasers exceeded a certain capacity threshold that made outages certain, foreseeable, or at least significantly more likely. Defendants' intentional or reckless disregard for this, so to maximize their profits through continued sales, was unfair and deceptive. Given the nature of a

live, unique sporting event like the Fight, Defendants knew or should have known that if outages occurred due to system overloads, the PPV broadcast would be compromised, interrupted portions of the live broadcast could not be recreated or reshown for those that missed it, and Plaintiffs and the Class would be injured.

75.    Sports fans, like those in the Class are deprived of value and harmed when they miss live broadcast events, learn the outcome of a sporting event without experiencing it live, learn scores, or view replays.

76.    Through their conduct, Defendants improperly and deceptively induced thousands of other consumers in the Class to purchase the Fight, and generated hundreds of millions of dollars and revenues in ill-gotten gains due to their deception such that Defendants were unjustly enriched.

77.    Given their superior and exclusive knowledge about the system capacity and shortfalls, as well as PPV sales levels, Defendants had a duty to tell consumers like Plaintiffs of the risks of outages presented, and at a reasonable point, to suspend further PPV sales to best protect the interests of consumers that had already made the investment. Instead, Defendants kept selling more and more PPV packages up to and through the opening bell, despite knowingly exceeding system capacity.

78.    Defendants' conduct and omissions described herein, *inter alia*: (a) breached contracts with Plaintiffs and the Class; (b) constitute deceptive and misleading conduct under the consumer protection laws set forth below, including the Nevada Unfair Trade Practices Act; (c) breached implied warranties of merchantability.

## CLASS ALLEGATIONS

79.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated (the "Class"). The Class is comprised of Plaintiffs and all other persons nationwide who paid money to watch the Mayweather-McGregor

fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.  Within the Class are three State Subclasses.

80.    Plaintiff Riley represents and is a member of the Class and Florida Subclass, defined as follows: "All persons in the State of Florida that paid money to watch the Fight on pay-per-view, purchased through UFC, UFC.com, UFC.tv, the UFC app, and/or other platform operated by Defendants."

81.    Plaintiff Adami represents and is a member of the Class and Illinois Subclass, defined as follows: "All persons in the State of Illinois that paid money to watch the Fight on pay-per-view, purchased through UFC, UFC.com, UFC.tv, the UFC app, and/or other platform operated by Defendants."

82.    Plaintiffs Duncan and Alicea represent and are members of the Class and Arizona Subclass, defined as follows: "All persons in the State of Arizona that paid money to watch the Fight on pay-per-view, purchased through UFC, UFC.com, UFC.tv, the UFC app, and/or other platform operated by Defendants."

83.    Excluded from the Class and Subclasses are: (a) any officers, directors, or employees of Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case.  Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Subclasses before the Court determines whether certification is appropriate.

84.    All requisite elements for class certification under Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) are satisfied with respect to the Class and all subclasses.

85.    Plaintiffs do not know the exact number of persons in the Class and Subclasses, but given the reported PPV revenues from the Fight and Florida's and Illinois' population, believe them to be in the several thousands, making joinder of all these actions impracticable.

86.    The identity of the individual members is ascertainable through Defendants' and/or Defendants' agents' records or by public notice.

87.    There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class and Subclasses. The questions of law and fact common to the Class and Subclasses predominates over questions affecting only individual Class members, and include, but are not limited to, the following:

      a.    Whether Defendants breached Class members' contracts for the PPV;

      b.    Whether Nevada law applies to the nationwide Class and whether Defendants' practices, described herein, violated Nevada consumer protection statutes, contract and other laws;

      c.    Whether Defendants' practices, described herein, violates FDUTPA;

      d.    Whether Defendants' practices, described herein, violates ICFA;

      e.    Whether Defendants' practices and sale of PPV packages of the Fight that could not be fully viewed, as described herein, breached implied warranties of merchantability;

      f.    Whether Defendants knew or should have known of system capacities and still sold excessive PPV packages; and

      g.    the correct measure of damages and other relief available.

88.    Plaintiffs will fairly and adequately protect the interest of the Class and Subclasses.

89.    Plaintiffs have retained the undersigned counsel who are experienced in consumer class action litigation and are competent to represent the Class and Subclasses.

90.    Plaintiffs' claims are typical of the claims of the Class and Subclasses which all arise from the same operative facts involving Defendants' practices.

91.    A class action is a superior method for the fair and efficient adjudication of this controversy.

92.    Classwide damages are essential to induce Defendants to comply with the laws as alleged in the Complaint.

93.    Class members are unlikely to prosecute such claims on an individual basis since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, *e.g.*, securities fraud.

94.    Defendants have acted on grounds generally applicable to the Class thereby making appropriate final declaratory relief with respect to the Class as a whole.

95.    Members of the Class and Subclasses are likely to be unaware of their rights.

96.    Plaintiffs contemplate providing notice to the putative Class and Subclass members by direct mail in the form of a postcard, via email, and via publication.

97.    Plaintiffs request certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) for equitable relief.

### INTENT

98.    All acts of Defendants described within were done intentionally and purposefully with a goal towards maximizing their profits and gain at the expense of Plaintiffs and the Class.

### FIRST CAUSE OF ACTION
#### Breach of Contract
#### (on behalf of all Class members)

99.    Plaintiffs incorporate by reference each allegation set forth above.

100.   Plaintiffs and each Class member entered into a contract with Defendants and/or their agents.

101.   Plaintiffs and each Class member paid the common price demanded (approximately $99), in exchange for a license to view the PPV of the Fight.

102.   Plaintiffs and each Class member paid the demanded price in exchange for a fully operational and complete PPV broadcast of the Fight, not a partial, intermittent, delayed, or otherwise incomplete broadcast.

103.   Defendants failed to provide a complete broadcast of the Fight to Plaintiffs and other members of the Class, depriving them of the benefit of their bargain.

104.   Defendants breached their contracts with Plaintiffs, causing injury, harm and financial loss, as described further herein.

105.   Defendants expected and foresaw that persons in the Class purchasing the PPV, like Plaintiffs, would host viewing parties and the like and spend money in relation thereto, such as on food, beverages, party supplies, and the like. Defendants also expected that Plaintiffs would forego other entertainment opportunities available to them on a summer Saturday night to see the unique event marketed as "The Biggest Fight in Combat Sports History." As a result special damages are due, in addition to actual damages and other relief.

106.   As a result of the foregoing, actual damages, consequential/special damages, and other appropriate relief are due to Plaintiffs and the Class, including but not limited refunds of the amounts paid for the PPV.

**SECOND CAUSE OF ACTION**
**Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. § 598.0915 *et seq.***
**(on behalf of all Class members)**

107.   Plaintiffs incorporate by reference each allegation set forth above.

108.   This claim, which asserts violations of the Nevada Deceptive Trade Practices Act (the "NDTPA"), Nev. Rev. Stat. § 598.0915 *et seq.* and Nev. Rev.

Stat. § 41.600(1), is asserted against each of the Defendants based on their conduct described above.

109.    Plaintiffs, each of the members of the Class, and each of the Defendants are "persons," within the meaning of sections 598.0915 and 598.0923 of the NDTPA.

110.    Plaintiffs and the members of the Class are "victim(s) or consumer fraud" within the meaning of Nev. Rev. Stat. § 41.600(1).

111.    PPV packages purchased are goods, commodities, and/or services within the meaning of NDTPA.    Federal and state statutes classify paid cable broadcasts as a "programming service." *See, e.g.*, 47 U.S.C.A. § 522; 47 C.F.R. § 76.5(ff).

112.    The conduct of Defendants, as alleged herein, constitutes unlawful practices that occurred in connection with the sale and or advertisement of goods and services, within the meaning of the NDTPA.

113.    Defendants' deceptive omissions, concealment and suppression of material fact, as described within, violated the NDTPA by:

    a.    Representing that goods or services for sale or lease were of a particular standard, quality, or grade, or that such goods were of a particular style or model, despite knowing that such goods or services were of another standard, quality, grade, style, or model, Nev. Rev. Stat. § 598.0915(7);

    b.    Advertising goods or services for sale or lease with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity, Nev. Rev. Stat. § 598.0915(10);

    c.    Failing to make delivery of goods or services for sale or lease within a reasonable time or to make a refund for the goods or services, if he or she allows refunds Nev. Rev. Stat. § 598.092(4), and;

    d.    Knowingly failing to disclose a material fact in connection with the sale or lease of goods or services, Nev. Rev. Stat. § 598.0923(2).

114.   As described herein, Defendants violated these provisions of NDTPA by engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce.

115.   Defendants sold PPV packages of the Fight to Plaintiffs and the Class when they knew or should have known that their broadcast systems had a finite capacity and that selling excessive packages would cause the system to crash and overload so that Class members would be periodically shut out of the broadcast and denied the ability to see the complete broadcast of the Fight.

116.   Instead of being upfront with consumers about its underpowered service, Defendants caused a likelihood of confusion and misunderstanding as to the source and quality of the HD video consumers would see on fight night. Defendants misrepresented the quality and grade of video consumers would see using its platforms and app, and knowingly failed to disclose that their system was defective with respect to the amount of bandwidth available and that Defendants' service would materially fail to conform to the quality of HD video Defendants promised.

117.   Despite the foregoing, PPV packages continued to be sold up until the opening bell, overloading the system and causing outages.  In turn, Plaintiffs and the Class could not view the entire Fight broadcast and were denied the benefit of their bargains.

118.   Defendants violated the NDTPA in at least the following respects:

      a.    through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) had characteristics, ingredients, and benefits which they do not have;

      b.    through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) were of a particular standard, quality or grade when they were

of another;

c.  through common omissions of material fact, Defendants advertised the PPV viewerships for the Fight with intent not to sell them as advertised; and

d.  through common omissions of material fact, Defendants represented that the PPV viewerships for the Fight were supplied in accordance with previous representations when they were not.

119.  Defendants knew, or should have known, that its omissions of facts about system capacities and overload risks were material to reasonable consumers like those in the Class. Had Class members been advised that the Defendants' systems risked overloading and crashing they would have taken different action, such as watching the Fight through alternative means available; not purchasing the Fight for the high price charged; or demanding in advance that Defendant limit total PPV sales to a manageable number that would not cause the system to overload.

120.  By way of the foregoing, Defendants deprived Plaintiffs and members of the Class the benefit of their bargain.

121.  Defendants' acts and practices alleged herein were intended to and did result in the sale of pay-per-view orders, in violation of the NDTPA, which Defendants' benefitted financially from.

122.  At all relevant times herein, Defendants, had a duty to disclose material facts to the Class, including those regarding the limitations of their systems and limited ability to deliver PPV packages in the volumes at issue.

123.  Facts regarding the limitations of Defendants' systems and limited ability to deliver PPV packages in the volumes at issue were within the exclusive control of Defendants and unable to be otherwise acquired by the Plaintiffs and the members of the Class prior to the commencement of the Fight by reasonable

means, yet were intentionally withheld and concealed by Defendants so not to disrupt sales.

124.    Even after Class members started to complain and report problems with the PPV download and outages on August 28, 2017, but before the commencement of the main event bout between Mayweather and McGregor, Defendants continued to sell even more PPV packages for Defendants' financial gain, without disclosure, but making the overload problem worse and risks Class members would be unable to view the Fight greater.

125.    Defendants knew that reasonable consumers, like those in the Class, would want to know about the outage and overload problem when deciding whether or not to the purchase the PPV of the Fight from Defendants at the high price advertised.    By concealing and suppressing that information, Defendants denied consumers in the Class the ability to make a rational and informed purchasing decision as to the purchase of the PPV package of the Fight from Defendants.    By the time Class members learned facts regarding the outages and overloads, and that the Fight could not be viewed on Defendants' platforms, it was largely too late – the main bout had started.

126.    Plaintiffs and members of the Class relied on Defendants' conduct and omissions, to the extent one can reasonable rely on statements omitted, concealed and not otherwise made.

127.    Defendants were in a position to communicate the concealed facts to Plaintiffs and the Class, through their various platforms, social media and the like, but failed to prior to the start of the Fight.

128.    As a direct result of Defendants' actions and omissions of material facts, Plaintiffs and Class members did not obtain the value of the goods, merchandise and/or services for which they paid; were induced to make purchases that they otherwise would not have; lost their ability to make an informed and

reasoned purchasing decision; and/or to demand and receive a refund before the Fight.

129. By way of the foregoing, Defendants have engaged in the knowing concealment, suppression, and omission of material facts with intent that others act upon such concealment, suppression, and omission, in connection with the sale or advertisement of any merchandise. Through their uniform concealment and suppression of material facts, Defendants engaged in deceptive conduct which created a likelihood of confusion or misunderstanding on the part of the Plaintiffs and Class members.

130. The NDTPA is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other Counts of this Amended Complaint.

131. Under the NDPTA and Nev. Rev. Stat. § 41.600(1), Plaintiffs and members of the Class have standing to pursue this claim because they suffered an ascertainable loss resulting from Defendants' conduct and are victims of consumer fraud.

132. As a direct and proximate cause of Defendants' omissions, which constitute deceptive trade practices and/or consumer fraud, as herein alleged, Plaintiffs and Class members have been damaged and suffered ascertainable losses measured by the cost of the pay-per-view showing, and other out-of-pocket expenses, thereby entitling them to recover compensatory damages, restitution, disgorgement, refunds of moneys, interest, treble damages, punitive damages, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

133. Based on the foregoing, Plaintiffs and all Class members are entitled to damages, declaratory and injunctive relief, and well as all other relief deemed just and equitable in the circumstances and as allowable by law.

**THIRD CAUSE OF ACTION**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201 *et seq.***
**(by Plaintiff Riley on behalf of Florida Subclass)**

134.   Plaintiffs incorporate by reference each allegation set forth above.

135.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

136.   Plaintiff Riley and each member of the Florida Subclass are consumers within the meaning of FDUTPA.

137.   PPV packages purchased are goods and/or services within the meaning of FDUTPA.   Federal and state statutes classify paid cable broadcasts as a "programming service." *See, e.g.*, 47 U.S.C.A. § 522; 47 C.F.R. § 76.5(ff).

138.   Defendants engaged in trade or commerce within the meaning of FDUTPA. Under FDUTPA "trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity. "Thing of value" may include, without limitation, any moneys, benefit, license, or interest.

139.   FDUTPA, Fla. Stat. §501.204, proscribes the following conduct: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

140.   As described herein, Defendants violated FDUTPA by engaging in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

141.   Defendants sold PPV packages of the Fight to Plaintiff and the Florida Subclass when they knew or should have known that their broadcast systems had a finite capacity and that selling excessive packages would cause the system to crash and overload so that Subclass members would be periodically shut out of the broadcast and denied the ability to see the complete broadcast of the Fight.

142.   Instead of being upfront with consumers about its underpowered service, Defendants caused a likelihood of confusion and misunderstanding as to the source and quality of the HD video consumers would see on fight night. Defendants misrepresented the quality and grade of video consumers would see using its platforms and app, and knowingly failed to disclose that their system was defective with respect to the amount of bandwidth available and that Defendants' service would materially fail to conform to the quality of HD video Defendants promised.

143.   Despite the foregoing, PPV packages continued to be sold up until the opening bell, overloading the system and causing outages.  In turn, Plaintiff and the Subclass could not view the entire Fight broadcast and were denied the benefit of their bargain.

144.   Defendants violated the FDUTPA in at least the following respects:

  e.   through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) had characteristics, ingredients, and benefits which they do not have;

  f.   through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) were of a particular standard, quality or grade when they were of another;

  g.   through common omissions of material fact, Defendants advertised the PPV viewerships for the Fight with intent not to

sell them as advertised; and

h.   through common omissions of material fact, Defendants represented that the PPV viewerships for the Fight were supplied in accordance with previous representations when they were not.

145.   Defendants knew, or should have known, that its omissions of facts about system capacities and overload risks were material to reasonable consumers like those in the Subclass. Had Florida Subclass members been advised that the Defendants' systems risked overloading and crashing they would have taken different action, such as watching the Fight through alternative means available; not purchasing the Fight for the high price charged; or demanding in advance that Defendant limit total PPV sales to a manageable number that would not cause the system to overload.

146.   By way of the foregoing, Defendants deprived Plaintiff and members of the Florida Subclass the benefit of their bargain.

147.   Based on the foregoing, Plaintiff and all Florida Subclass members are entitled to actual damages, declaratory and injunctive relief, and well as all other relief deemed just and equitable and allowable by law or equity.

## FOURTH CAUSE OF ACTION
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*.
### (by Plaintiff Adami on behalf of Illinois Subclass)

148.   Plaintiffs incorporate by reference each allegation set forth above.

149.   This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*. ("ICFA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

150.   Defendants' misrepresentations, individually and collectively, as set forth above, are deceptive practices prohibited by Section 2 of the ICFA. 815 Ill. Comp. Stat. 505/2.

151.   Defendants engaged in trade or commerce within the meaning of ICFA. Under the ICFA "trade" and "commerce" mean "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of [Illinois]." 815 Ill. Comp. Stat. 505/1(f).

152.   ICFA, 815 Ill. Comp. Stat. 505/2, proscribes the following conduct: "the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact… in the conduct of any trade or commerce... whether any person has in fact been misled, deceived or damaged thereby."

153.   As described herein, Defendants violated ICFA by engaging unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce.

154.   Defendants sold PPV packages of the Fight to Plaintiff and the Illinois Subclass when they knew or should have known that their broadcast systems had a finite capacity and that selling excessive packages would cause the system to crash and overload so that Subclass members would be periodically shut out of the broadcast and denied the ability to see the complete broadcast of the Fight.

155.   Instead of being upfront with consumers about its underpowered service, Defendants caused a likelihood of confusion and misunderstanding as to the source and quality of the HD video consumers would see on fight night. Defendants misrepresented the quality and grade of video consumers would see using its platforms and app, and knowingly failed to disclose that their system was

defective with respect to the amount of bandwidth available and that Defendants'
service would materially fail to conform to the quality of HD video Defendants
promised.

156.   Despite the foregoing, PPV packages continued to be sold up until the
opening bell, overloading the system and causing outages.  In turn, Plaintiff and
the Illinois Subclass could not view the entire Fight broadcast and were denied the
benefit of their bargain.

157.   Defendants violated the ICFA in at least the following respects:

a.   through common omissions of material fact, Defendants
represented that the viewerships sold for the Fight (the PPV)
had characteristics, ingredients, and benefits which they do not
have;

b.   through common omissions of material fact, Defendants
represented that the viewerships sold for the Fight (the PPV)
were of a particular standard, quality or grade when they were
of another;

c.   through common omissions of material fact, Defendants
advertised the PPV viewerships for the Fight with intent not to
sell them as advertised; and

d.   through common omissions of material fact, Defendants
represented that the PPV viewerships for the Fight were
supplied in accordance with previous representations when
they were not.

158.   The above-described deceptive and/or unfair acts were perpetrated by
Defendants with the intent for Plaintiff and members of the Illinois Subclass to rely
on the deception in order maximize revenue. Defendants' conduct offends public
policy and caused substantial injury to consumers.

159.   Defendants knew, or should have known, that its omissions of facts about system capacities and overload risks were material to reasonable consumers like those in the Illinois Subclass.  Had Subclass members been advised that the Defendants' systems risked overloading and crashing they would have taken different action, such as watching the Fight through alternative means available; not purchasing the Fight for the high price charged; or demanding in advance that Defendant limit total PPV sales to a manageable number that would not cause the system to overload.

160.   By way of the foregoing, Defendants deprived Plaintiff and the Illinois Subclass the benefit of their bargain.

161.   Based on the foregoing, Plaintiff and all Illinois Subclass members are entitled to actual damages, declaratory and injunctive relief, and well as all other relief deemed just and equitable and allowable by law or equity.

### FIFTH CAUSE OF ACTION
**Violation of Arizona Consumer Fraud Act,**
**Ariz. Rev. Stat. § 44-1521 *et seq*.**
**(by Plaintiffs Duncan and Alicea on behalf of Arizona Subclass)**

162.   Plaintiffs incorporate by reference each allegation set forth above.

163.   This cause of action is brought pursuant to the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq*. ("ACFA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

164.   Plaintiff Duncan, Plaintiff Alicea, and the members of the Arizona Subclass are each a "person" as defined in section 14-1521 of the ACFA.

165.   The ACFA broadly prohibits deceptive and misleading practices.

166.   The ACFA proscribes the following conduct: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment,

suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. § 44-1522(A).

167.   PPV packages purchased are merchandise within the meaning of ACFA, defining "merchandise" as any object, wares, goods, commodities, intangibles, real estate or services. Ariz. Rev. Stat. § 44-1521. Federal and state statutes classify paid cable broadcasts as a "programming service." *See, e.g.*, 47 U.S.C.A. § 522; 47 C.F.R. § 76.5(ff).

168.   As described herein, Defendants violated ACFA by engaging in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

169.   Defendants sold PPV packages of the Fight to Plaintiffs and the Arizona Subclass when they knew or should have known that their broadcast systems had a finite capacity and that selling excessive packages would cause the system to crash and overload so that Class members would be periodically shut out of the broadcast and denied the ability to see the complete broadcast of the Fight.

170.   Instead of being upfront with consumers about its underpowered service, Defendants caused a likelihood of confusion and misunderstanding as to the source and quality of the HD video consumers would see on fight night. Defendants misrepresented the quality and grade of video consumers would see using its platforms and app, and knowingly failed to disclose that their system was defective with respect to the amount of bandwidth available and that Defendants' service would materially fail to conform to the quality of HD video Defendants promised.

171.   Despite the foregoing, PPV packages continued to be sold up until the opening bell, overloading the system and causing outages.  In turn, Plaintiffs and

the Subclass could not view the entire Fight broadcast and were denied the benefit of their bargain.

172.    Defendants violated the ACFA in at least the following respects:

i.    through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) had characteristics, ingredients, and benefits which they do not have;

j.    through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) were of a particular standard, quality or grade when they were of another;

k.    through common omissions of material fact, Defendants advertised the PPV viewerships for the Fight with intent not to sell them as advertised; and

l.    through common omissions of material fact, Defendants represented that the PPV viewerships for the Fight were supplied in accordance with previous representations when they were not.

173.    The above-described deceptive and/or unfair acts were perpetrated by Defendants with the intent for Plaintiffs and members of Class to rely on the deception in order maximize revenue. Defendants' conduct offends public policy and caused substantial injury to consumers.

174.    Defendants knew, or should have known, that its omissions of facts about system capacities and overload risks were material to reasonable consumers like those in the Class. Had Class members been advised that the Defendants' systems risked overloading and crashing they would have taken different action,

such as watching the Fight through alternative means available; not purchasing the Fight for the high price charged; or demanding in advance that Defendant limit total PPV sales to a manageable number that would not cause the system to overload.

175.   By way of the foregoing, Defendants deprived Plaintiffs and members of the Arizona Subclass the benefit of their bargain.

176.   Based on the foregoing, Plaintiffs Duncan and Alicea and all Arizona Subclass members are entitled to actual damages, declaratory and injunctive relief, as well as all other relief deemed just and equitable and allowable by law or equity.

### SIXTH CAUSE OF ACTION
**Unjust Enrichment/Money Had and Received**
**(on behalf of all Class members)**

177.   Plaintiffs incorporate by reference each allegation set forth above.

178.   Through the above described acts and conduct, Defendants received money, directly or indirectly, from Plaintiffs and the Class which in equity and good conscious they cannot and should not retain.

179.   Through the above described acts and conduct, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

180.   Defendants' continued retention of these sums is unjust.

181.   Based on the foregoing, Defendants should be required to disgorge all such profits, and provide restitution and/or damages as may be available at law or equity.

### SEVENTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**(on behalf of all Class members)**

182.   Plaintiffs incorporate by reference each allegation set forth above.

183.   Plaintiffs and Class members purchased PPV broadcast package and paid money directly to Defendants.  Plaintiffs and the Class were the intended end users and intended and foreseeable viewers/users of the PPV packages sold. Alternatively, Plaintiffs and the Class were intended third party beneficiaries of the PPV packages sold.

184.   Through the above conduct, Defendants breached the implied warranty of merchantability with respect to the PPV broadcast packages sold.

185.   The PPV broadcast packages sold were intended and expected to operate so that all purchasers, including Plaintiffs and the Class, would be able to easily download, start, and view the entire broadcast of the Fight without interruption or delay.

186.   The PPV broadcast packages sold to Plaintiffs and the Class failed to so operate and permit Plaintiffs and the Class to view the entire Fight broadcast without interruption. Through such conduct, Defendants violated the implied warranty of merchantability related to the PPV broadcasts sold to Plaintiffs and the Class.

187.   As a result of the foregoing, Plaintiffs and the Class were denied the benefit of their bargains, were injured, and suffered financial loss.

188.   As a result of the foregoing, actual damages, consequential/special damages, and other appropriate relief are due to Plaintiffs and the Class, including but not limited refunds of the amounts paid for the PPV.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class members pray for judgment as follows as to all counts:

A.   Certifying the Class and Subclasses as requested herein pursuant to Fed. R. Civ. P. 23(a), 23(b)(9), 23(b)(2), and 23(b)(3), appointing Plaintiffs representatives of the Class and their respective State Subclasses, and the undersigned counsel as counsel for the Class and Subclasses;

B.   Restitution of the funds obtained by Defendants from the Class and Subclasses, directly or indirectly;

C.   Disgorgement of the funds obtained by Defendants from the Class and Subclasses, directly or indirectly;

D.   Actual, consequential, punitive, and other damages on all such claims where such relief is permitted by law;

E.   All reasonable and necessary attorneys' fees and costs provided by statute, common law, equity, or the Court's inherent power;

F.   For equitable and declaratory relief; and,

G.   Any and all other relief that this Court deems just and proper at law or equity.

Respectfully submitted,

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
  */s/ David A. Markman*

Dated: September 1, 2017

David A. Markman (Nevada Bar No. 12440)
  E-mail: dmarkman@lipsonneilson.com
9900 Covington Cross Dr., Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 Telephone
(702) 382-1512 Facsimile

Caleb Marker (Pro Hac Vice Pending)
ZIMMERMAN REED LLP
  E-mail: caleb.marker@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, California 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

Hart L. Robinovitch (Pro Hac Vice Pending)
ZIMMERMAN REED LLP
  E-mail: hart.robinovitch@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile

*Attorneys for Plaintiffs*

COMPLAINT                                                                    40